AO 106 (Rev. 06/09)   Application for a Search Warrant

## UNITED STATES DISTRICT COURT FILED

### for the

### Northern District of Oklahoma

DEC 2 6 2019

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

In the Matter of the Search of
**INFORMATION ASSOCIATED WITH FACEBOOK
USER ID 100036051073775 THAT IS STORED AT PREMISES
CONTROLLED BY FACEBOOK INC.**

)
)
)
)
)

Case No. 19-mj-278-PJC

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 1591(a)(1), 1591(a)(2), and 1591(b)(1) | Sex Trafficking by Force, Fraud and Coercion |
| 18 U.S.C. § 1591(d) | Attempted Obstruction of Sex Trafficking Enforcement |
| 18 U.S.C. § 1513(b)(2) | Retaliating Against a Victim and Causing Bodily Harm |
| 18 U.S.C. § 2421(a) | Transporting Individual for Prostitution |
| 18 U.S.C. § 2421A(a) | Online Promotion and Facilitation of Prostitution |

The application is based on these facts:

**See Affidavit of Justin Oxford, attached hereto**.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Justin Oxford, TPD-FBI Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/26/2019

_____
*Judge's signature*

City and state:  Tulsa, Oklahoma

Paul J. Cleary, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID 100036051073775 THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 19-mj-278-PJC<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Justin Oxford, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for

information associated with a certain Facebook user ID that is stored at premises owned,

maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking

company headquartered in Menlo Park, California.  The information to be searched is described

in the following paragraphs and in Attachment A.  This affidavit is made in support of an

application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to

require Facebook to disclose to the government records and other information in its possession,

pertaining to the subscriber or customer associated with the user ID.

2.      I am an FBI Task Force Officer with the Tulsa Police Department and have been

since March of 2019.  I have been a police officer for over 12 years.  I received a bachelor's

degree in organizational leadership from the University of Southern Nazarene in Bethany,

Oklahoma.  In August of 2016, I was assigned to the Special Investigations Division, Vice unit.

While assigned to the Vice Unit, I worked in an undercover capacity investigating street level

narcotics, illegal gambling, prostitution, pandering, and human trafficking crimes. In March of

2017, I completed a 36-hour Vice and Human Trafficking Investigations school in Daytona, Florida. In July of 2017, I completed the two-week Basic Narcotics Investigator School hosted by the United States Drug Enforcement Administration training staff. Furthermore, I served on the U.S. Attorneys Human Trafficking Task Force from August 2016- March 2019. I regularly attended and presented material at the Office of The Attorney General of Oklahoma at the Human Trafficking Intelligence meetings in Oklahoma City.

3.      I have been involved in numerous, prostitution, pandering, and human trafficking investigations. This experience includes physical surveillance, participation with other agents in the consensual and court-authorized electronic surveillance of human trafficking and pandering activities, the execution of evidentiary search warrants, and search warrants for documents and records related thereto.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 USC 1591, 18 USC 1591(d), 18 USC 1512, 18 USC 2422, 18 USC 2422A, and 18 USC 1513 have been committed by Ramar Palms. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

6.      On November 20, 2018, I was working in a plain clothes capacity and conducting prostitution investigations using websites known for soliciting prostitution, such as

www.cityxguide.com.  I discovered an advertisement on cityxguide.com for a "Lunch Break

Special."  The photographs of the female in the advertisement appeared to be an under-age

juvenile.  I sent a text message to the phone number associated with the advertisement, asking if

she still had her $100.00 Quick Visit Special (Prostitution deal lasting less than 15 minutes.).

The female confirmed she was available and directed me to the Peoria Inn Motel, located at 1347

E. Skelly Drive, room #220 in Tulsa, Tulsa County, Oklahoma.

7.      When I arrived at the Peoria Inn Motel I parked near the office.  I exited my

vehicle and walked across the parking lot to the stairwell leading up to room #220.  As I

approached the stairwell, I noticed a black male, who was later identified as, Ramar Palms sitting

in an SUV at the bottom of the stairs.  Palms watched me walk up the stairs and to the room.

8.      I knocked on the door to room #220 and was invited in the room by a white

female later identified as Mary Walton.  Once inside the room, I placed $100.00 on the night

stand and Walton began getting undressed.  I asked Walton if there was anything she did not do.

Walton replied, "not really."  I asked Walton if we could start with oral sex in which she agreed

to the sex act.  I then identified myself as a Tulsa Police Officer and told her she was under arrest

for Engaging in Prostitution.  I directed the arrest team to detain Palms, who was still sitting in

the SUV at the bottom of the stairs.

9.      I asked Walton for identification.  Walton told me her Oklahoma Drivers license

was stored in her purse in the night stand.  I retrieved Walton's purse from the night stand, which

contained a black .380 hand gun, Walton's Oklahoma Drivers License, Walton's concealed carry

permit, Palm's Oklahoma Identification Card, and three condoms.  Sgt. Todd Evans picked up

Walton's cell phone which was open to a message from Palms letting her know I had arrived and

I looked "kool," meaning he did not think I was a law enforcement officer.

10.     Walton stated Palms was collecting her money from prostitution deals and providing security during the dates.  Palms guided Walton through posting advertisements for prostitution on websites known for prostitution.  Palms would transfer money to Walton's bank account to pay for prostitution advertisements in an effort to distance himself from the criminal aspect of the prostitution.  Palms would threaten Walton if she did not do at least five prostitution dates a night. Palms would slap Walton with his knuckles and rings on his fingers if she did not get enough prostitution dates.  Palms provided security during the prostitution dates by making Walton text him when the client had arrived and when the prostitution deal was completed.  If a client stayed past time Palms would come up to the room and confront the client. Palms provided condoms for Walton to use during the prostitution deals by getting free condoms at the health department.

11.     Walton told Officers she had first met Palms while working as a bartender at the Ambassador Lounge in Tulsa.  Shortly after meeting Palms, Walton was invited by Palms to take a road trip to Louisiana.  Walton and Palms took a road trip to Louisiana in Walton's car. Walton stated while driving on a desolate stretch of highway in Louisiana, Palms stopped the car, turned to Walton and said, "you know I'm a pimp?" Palms told Walton that she is going to quit her job and work for him as a prostitute.  Palms subsequently drove Walton to a hotel in Louisiana where he engages in degrading sexual acts with Walton.  Palms then transports Walton across state lines to Houston, Texas to a second hotel where Walton began working as a prostitute for Palms.  Palms transported Walton on two subsequent trips to Louisiana, Texas, and Oklahoma for the purpose of prostitution.

12.     Palms cellular phone was seized as evidence after his arrest on November 20, 2019. A cellibrite forensic examination was conducted on the cellular device and a report was

generated.  There were several text messages from Palms to Walton, directing Walton on prices, times, and places for prostitution acts to be conducted.  In several messages, Palms directs Walton to place advertisements for prostitution on the website www.cityxguide.com and what content to put on the advertisements.  Recovered text messages also show Palms directing an individual named "Kammy" to engage in multiple acts of prostitution, including the setting of prices, locations, and sex acts. Facebook messages recovered from the Palms' phone show discussions with Kammy on her meeting with men in the Tulsa area, presumably for additional prostitution acts.

13.     After Palms' November 20 arrest, he was released on bond. He continued to force Walton to engage in prostitution, facilitated by the internet. Investigators located a Whatsyourprice.com advertisement of Walton that was posted on December 9, 2018. Investigators also discovered a December 2019 Whatsyourprice.com advertisement for Kristin Shepherd, a girlfriend of Palms and mother of one of his children.

14.     On January 9, 2019, Walton meet Palms at the Market Pub location at 5058 S. 79th East Avenue.  While hanging out at the Market Pub there was an argument between Walton and two females, Sasha Hawkins and Hannah McDonnell.  Walton and Palms walked to the parking lot, at which point Palms grabbed Walton by the throat and threw her on the ground. Palms threw Walton back down to the ground two more times as she tried to stand up.  Palms punched Walton in the face while yelling "bitch, I know you are working with the police! I'm gonna kill you, if you don't get in the truck!"  Walton stated patrons from the bar were outside and broke up the altercation preventing Palms from dragging her into the vehicle.  Walton told investigators Palms stole her .380 hand gun and her debit cards from her purse before leaving.  I

met with Walton on January 10, 2019 to file a Domestic Violence Report and observed injuries on Walton consistent with her statement about the altercation.

15.     Palms was indicted in the Northern District of Oklahoma for Sex Trafficking by Force, Obstruction of Sex Trafficking Enforcement, and Retaliation Against a Victim in June 2019. A December 2-5 jury trial resulted in a mistrial, with retrial set for January 21. A December superseding indictment charged Palms with Transportation for Prostitution and Online Promotion and Facilitation of Prostitution.

16.     Investigators located a Facebook profile for Palms under the alias "Frank Mathews." The "Frank Matthews" Facebook profile has a publicly visible account ID number of 100036051073775. After denying any prior relationship with Palms, McDonnell provided testimony that she was in fact friends with the Facebook profile Frank Mathews. McDonnell testified that the photograph attached to the Frank Mathews profile was Palms. McDonnell further testified that Palms' contacted her and asked her to provide testimony or an affidavit on his behalf.

17.     I have also reviewed multiple jail phone calls, emails, and video communications of the defendant. In multiple messages Palms discusses the intent to make his case go viral and discusses crafting a social media narrative to be posted and shared. On December 16, 2019, Palms' mother, Natalie McCurtain Palms, posted an extensive Facebook post with a photo of Walton and an extensive narrative of the case. The post includes information about the victim's sexual history, which has been excluded from the case. After the posting of these messages, Palms acknowledges the existence of the post, showing an apparent ability to access Facebook from jail.

18.     I know through my training and experience that Facebook is commonly used as a recruitment tool for sex traffickers. It is often used to conduct illegal business with victims, co-conspirators, and clientele. Facebook accounts with fake profile names are often used to conspire with other co-conspirators to intimidate witnesses and victims for the government.

19.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

20.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

21.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

22.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

23.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

24.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a

user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

25.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

26.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

27.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

28.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

29.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

30. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

31. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

32. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

33. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

34. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

conduct under investigation, thus enabling the United States to establish and prove each element

or alternatively, to exclude the innocent from further suspicion. In my training and experience, a

Facebook user's IP log, stored electronic communications, and other data retained by Facebook,

can indicate who has used or controlled the Facebook account. This "user attribution" evidence

is analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence. For example, profile contact information, private messaging logs, status updates, and

tagged photos (and the data associated with the foregoing, such as date and time) may be

evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook

account activity can show how and when the account was accessed or used. For example, as

described herein, Facebook logs the Internet Protocol (IP) addresses from which users access

their accounts along with the time and date. By determining the physical location associated

with the logged IP addresses, investigators can understand the chronological and geographic

context of the account access and use relating to the crime under investigation. Such information

allows investigators to understand the geographic and chronological context of Facebook access,

use, and events relating to the crime under investigation. Additionally, Facebook builds geo-

location into some of its services. Geo-location allows, for example, users to "tag" their location

in posts and Facebook "friends" to locate each other. This geographic and timeline information

may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account

activity may provide relevant insight into the Facebook account owner's state of mind as it

relates to the offense under investigation. For example, information on the Facebook account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort

to conceal evidence from law enforcement).

35.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

36.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

37.     Based on the forgoing, I request that the Court issue the proposed search warrant.

38.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

39.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

40.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING

41.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Justin Oxford
FBI Task Force Officer
Tulsa Police Department

Subscribed and sworn to before me on _December 26_, 2019

Paul J. Cleary
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user

ID<u>100036051073775</u> that is stored at premises owned, maintained, controlled, or operated by

Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)      All contact and personal identifying information, including for user IDs: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities **August 2018 to December 2019**;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **August 2018 to December 2019**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)      All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user **August 2018 to December 2019**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account **August 2018 to December 2019** All information about the user's access and use of Facebook Marketplace;

(m)    The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any

         payments associated with the service (including any credit card or bank account

         number);

(o)     All privacy settings and other account settings, including privacy settings for

         individual Facebook posts and activities, and all records showing which Facebook

         users have been blocked by the account;

(p)     All records pertaining to communications between Facebook and any person

         regarding the user or the user's Facebook account, including contacts with support

         services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within

**14 days** of issuance of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and

instrumentalities of violations of 18 USC 1591(d), 18 USC 1512, 18 USC 1513 involving Ramar

Travelle Palms a.k.a Frank Mathews since August 1, 2018, including, for each user ID identified

on Attachment A, information pertaining to the following matters:

> (a)  Evidence relating to sex trafficking, online promotion of prostitution,
>
>       transportation for prostitution, and intimidation or retaliation against a victim or
>
>       witness.
>
> (b)  Evidence indicating how and when the Facebook account was accessed or used,
>
>       to determine the chronological and geographic context of account access, use, and
>
>       events relating to the crime under investigation and to the Facebook account
>
>       owner;
>
> (c)  Evidence indicating the Facebook account owner's state of mind as it relates to
>
>       the crime under investigation;
>
> (d)  The identity of the person(s) who created or used the user ID, including records
>
>       that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other

records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted

by any government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the government, attorney support staff, and

technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed

electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO</u>
## <u>FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws

of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in

this certification is true and correct.  I am employed by Facebook, and my title is

_____.  I am qualified to authenticate the records attached hereto

because I am familiar with how the records were created, managed, stored, and retrieved.  I state

that the records attached hereto are true duplicates of the original records in the custody of

Facebook.  The attached records consist of _____ **[GENERALLY DESCRIBE**

**RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the

occurrence of the matter set forth by, or from information transmitted by, a person with

knowledge of those matters, they were kept in the ordinary course of the regularly conducted

business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that

produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or

file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the

original records; and

2.      the process or system is regularly verified by Facebook, and at all times

pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____

Date                                    Signature